**UNITED STATES DISTRICT COURT**
**DISTRICT OF PUERTO RICO**

PALMER PAXTON STOUTT, et al.
Plaintiff,

  v.             CIV. No. 97-2819 (DRD)

BANCO POPULAR DE PUERTO RICO, et al.
Defendant.

## OPINION AND ORDER

The above captioned diversity action was filed on December 4, 1997, by plaintiff Palmer

Paxton Stoutt (" Stoutt") against defendant Banco Popular de Puerto Rico ("BPPR").  Plaintiff,

alleging unlawful arrest, malicious prosecution and illegal incarceration, seeks compensatory

damages under Article 1802, the general torts statute of the Puerto Rico Civil Code, 31 P.R.

LAWS ANN. § 5141 (1956).  Plaintiff also seeks redress alleging that the criminal prosecution

instigated by BPPR has caused considerable damage to plaintiff's commercial good standing and

prestige.  Finally, plaintiff alleges that defendant is liable for defamation for instigating the

publication of false allegations regarding plaintiff's bank account with BPPR.

Defendant, BPPR, alleges as an affirmative defense immunity from any liability since the

actions were taken pursuant to the reporting requirements of the Annunzio Wylie Act. See Pub.

L. No. 102-550 (codified as amended in scattered sections of the United States Code).  The Act,

under its "safe harbor" provision 31 U.S.C. § 5813(g)(3), provides that reporting financial

institutions are immune from liability "under any law or regulation of the United States or any

constitution, law, or regulation of any state . . ." for disclosures made pursuant to its

AO 72
(Rev 8/82)

requirements. Such immunity would bar Plaintiff's's federal and civil law claims. However, in the Opposition to defendant's motion for Summary Judgment, plaintiff alleges that such immunity can only be granted if the disclosure was made in good faith. Defendant disagrees.

Pending before the court is a motion for summary judgment filed by defendant, BPPR, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 311.12 and plaintiff Stoutt's opposition thereto. (Docket Nos. 75 & 89).

## I. BACKGROUND

Plaintiff Stoutt is a resident of Tortola, British Virgin Islands. Stout is also President and Chief Executive Officer of Rancal International, Inc. and Rancal Corporation Limited, plaintiffs in this matter. Defendant, BPPR, is a banking institution organized and existing under the laws of the Commonwealth of Puerto Rico with its principal place of business in Puerto Rico.

The relevant facts stated in the light most favorable to the non-movant are as follows. On or about June 1995, Stoutt entered into negotiations with BPPR to secure a loan for a term of five years and in the amount of $1,500,000. Prior to these negotiations, Stoutt and BPPR had a long standing commercial relationship. Through a letter dated June 23, 1995, from José Enrique Guzmán ("Guzmán"), Manager for a branch of BPPR, Stoutt was informed that the loan he requested would be approved should he secure sufficient collateral. After meeting with bank officials in late June 1995, and having preliminary loan approval, Stoutt proceeded to attempt to secure United States Treasury Bills as collateral to be deposited in an acceptable security firm.

Attempting to secure the required collateral, Stoutt was referred to, and in July 1995 contacted, Brian Schmidt ("Schmidt") from Euro-Atlantic Securities in Chicago. Schmidt

Page 2 of 15

suggested leasing ten million dollars in U.S. Treasury Bills. He explained that such a lease would secure the needed collateral for the loan with BPPR, while at the same time allow the remainder to be invested. The investment of the remaining Treasury Bills would supposedly produce enough money to pay for the substantial monthly lease cost. The cost of leasing the U.S. Treasury Bills was $300,000.00 monthly. Since Euro-Atlantic required evidence of sufficient funds for a good-faith deposit of $300,000.00, Stoutt contacted Guzmán, from BPPR, to secure a line of credit in that same amount. On July 21, 1995, Guzmán sent Stoutt a letter indicating that the required line of credit had been approved by BPPR.

Stoutt then went about securing the ten million dollars in U.S. Treasury Bills as collateral. After signing the Treasury Bill Assignment Contract, plaintiff met with Guzmán to finalize the transaction and secure the $300,000.00 good-faith deposit. Subsequently, when presented with the signed final documents, Guzmán allegedly proposed that instead of using the previously granted line of credit, plaintiff was to deposit a check from Rancal International, against which the wire transfer for the deposit would be effectuated. The check from Rancal International, though without sufficient funds at that time, would be covered once the Treasury Bills were deposited in plaintiff's account. After the check from Rancal International was deposited with BPPR, a wire transfer for the initial $300,000.00 good-faith deposit was made from BPPR to a Citibank account in New York in the name of Lenco Securities Corporation.

After Euro-Atlantic received the initial deposit, the firm was to release the U.S. Treasury Bills to Stoutt by depositing them in an account that had been arranged with La Jolla Capital. La Jolla Capital would then transfer $800,000.00 to Rancal International's account from which the initial check drawn for $300,000.00 would be covered. The entire transaction was designed to

AO 72
(Rev 8/82)

move quickly ensuring that no overdraft in Rancal International's account would occur. In any case, plaintiff avers that Guzmán requested him to sign a blank promissory note to cover the overdraft. After delays in the opening of the account with La Jolla Capital, Stoutt discovered that the initial deposit had been sent to William Avent and John Dilworth. Said deposit was supposed to be held in an escrow account until the Treasury Bills were deposited in Stoutt's account.

On September 5, 1995, BPPR was informed that the check deposited by plaintiff, against which BPPR effectuated a $300,000.00 wire-transfer, did not have sufficient funds for clearance. As a result, plaintiff's account with BPPR had a $300,000.00 overdraft. On September 18, 1995, fearing any action for check kiting,[1] plaintiff wrote BPPR, explaining that the Treasury Bill transaction had not been completed as expected and, therefore, the Rancal International account had insufficient funds to cover the check made to BPPR. However, plaintiff explained that he was to receive the funds by September 22, 1995. On September 26, 1995, plaintiff again wrote to BPPR clarifying that he expected to resolve the matter within forty-eight hours.

Apparently, by the end of September 1995, plaintiff realized that the Treasury Bill transaction had been a sham and decided to retain a Chicago counsel to recover the $300,000.00 deposit from Euro-Atlantic Securities. Plaintiff further complained with the Securities Exchange Commission and the National Association of Securities Dealer. On October 11, 1995, plaintiff received notice from his counsel informing him that the wire transfer would be completed a day

---

[1] Check kiting is defined as "writing checks against a bank account where funds are insufficient to cover them, hoping that before they are presented the necessary funds will be deposited." BLACK'S LAW DICTIONARY 870 (6th ed. 1990).

AO 72
(Rev 8/82)

later. Stoutt immediately wrote BPPR on the same date, informing that the wire transfer to his account would be completed within a day and he therefore could satisfy the overdraft. However, on October 13, 1995, plaintiff again wrote defendant explaining that his efforts to recuperate the $300,000.00 had been fruitless, that there had been no foul play intended on his part, and requesting more time to secure the money.

As plaintiff alleges, Guzmán, in a memo to BPPR superiors, presented inaccurate and incomplete information as to the nature of the $300,000.00 wire transfer. Guzmán's memo to superiors, failed to indicate the knowledge of the transactions that, as Plaintiff alleges, had been previously arranged and discussed with Guzmán. BPPR subsequently reported the transaction to their security division. After an investigation, on November 13, 1995, defendant filed a Report of Apparent Crime with the Federal Bureau of Investigation and the office of the U.S. Attorney. On November 15, 1995, BPPR officials met with FBI agent Anne Costello who, using the allegedly incomplete information provided by Guzmán, by then a former employee, decided that there was apparent bank fraud due to check kiting. After interviewing several of the parties allegedly involved, Special Agent Costello, on December 4, 1995, arrested Stoutt. Thereafter, on December 5, 1995, the FBI issued a news release as to the complaint filed against Stoutt. On February 7, 1996, Assistant U.S. Attorney Joseph Frattallone filed a motion to dismiss the case against plaintiff, Stoutt, because of insufficient evidence.

Plaintiff avers that had defendants provided the FBI accurate and/or complete information about how and why the wire transfer to New York was effectuated, no criminal changes would have resulted. As explained by Special Agent Costello in her deposition, none of the interviews conducted outside of bank personnel contributed to a finding of probable cause for the filling of

Page 5 of 15

the criminal charges.   Therefore, plaintiff alleges that only information that was inaccurate or

incomplete, as reported by defendant's official,  Guzmán, led to the prosecution and filing of

criminal charges for check kiting.  Plaintiff alleges that BPPR encouraged the FBI to criminally

prosecute Stoutt and to issue a press release which was detrimental to plaintiff's reputation.

Defendant now moves the Court to grant Summary Judgment, based on the "safe harbor"

provisions of the Annunzio Wylie Act, which grants immunity from disclosures by financial

institutions of suspicious transactions or possible violations of law.

## II. SUMMARY JUDGMENT STANDARD

The function of summary judgment is "to pierce the boilerplate of the pleadings and

examine the parties' proof to determine whether a trial is actually necessary."  Vega-Rodriguez v.

Puerto Rico Tel. Co., 110 F.3d 174, 178 (1st Cir. 1997).  Accordingly, federal courts will grant

summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to judgment as a matter of law."  FED. R .CIV. P. 56(c).

See also Cortes-Irizarry v. Corporación Insular, 111 F.3d 184, 187 (1st Cir. 1997) (Summary

judgment will be denied where there is "a trial worthy issue as to some material facts.").  A fact is

deemed "material" if the same "potentially affect[s] the suit's determination."  Garside v. Osco

Drug Inc., 895 F.2d 46, 48 (1st Cir. 1990).  "An issue concerning such a fact is 'genuine' if a

reasonable fact finder, examining the evidence and drawing all reasonable inferences helpful to

the party resisting summary judgment, could resolve the dispute in that party's favor."

Cortes-Irizarry, 111 F.3d at 187.  Nonetheless, "speculation and surmise, even when coupled

with effervescent optimism that something definite will materialize further down the line, are impuissant on the face of a properly documented summary judgment motion." Ayala Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 95 (1st Cir. 1996) (internal citations omitted).

The movant for summary judgment, of course, must not only show that there is "no genuine issue of material facts," but also, that he is "entitled to judgment as a matter of law." Vega-Rodriguez, 110 F.3d at 178. Further, the court is required to examine the record "drawing all reasonable inferences helpful to the party resisting summary judgment." Cortes-Irizarry, 111 F.3d at 187. There is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, no room for the judge to superimpose his own ideas of probability and likelihood . . . ." Greenburg v. Puerto Rico Maritime Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987).

"We believe that summary judgment procedures should be used sparingly . . . where the issues of motive and intent play leading roles . . . . It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.'" Poller v. Columbia Broad. Sys., 368 U.S. 470, 473, 82 S.Ct. 486, 491 (1962); cf Pullman-Standard v. Swint, 456 U.S. 273, 288-90, 102 S.Ct. 1781, 1790-91 (1982) (discriminatory intent is a factual matter for the trier of fact); see also William Coll. v. P.B. Diagnostic Sys., Inc., 50 F.3d 1115, 1121 (1st Cir. 1995); Oliver v. Digital Equip. Corp., 846 F.2d 103, 107 (1st Cir. 1988); Lipsett v. University of P.R., 864 F.2d 881, 895 (1st Cir. 1988). "Under such circumstances, jury judgments about credibility are typically thought to be of special importance." Stepanischen v. Merchants Despatch Transp. Corp., 722 F.2d 922, 928

(1st Cir. 1983).  Recently, the First Circuit Court reiterated the caution on issuing summary judgment wherein there are potential issues of motive and intent.  Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 433 (1st Cir. 2000) ("[D]eterminations of motive and intent, . . . are questions better suited for the jury.") (citing Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 677 (1st Cir. 1996).  However, "even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and  unsupported speculation." Ayala-Gerena, 86 F.3d at 95.  When adjudicating a motion for summary judgment the facts must be examined under the above criteria because on a potential appeal the appellate court examines "the undisputed facts in the light most congenial to the appellants and adopts their version of any contested facts which are material to our consideration of the issues." Vega-Rodriguez, 110 F.3d at 178.

FED. R. CIV. P. 56(e) requires parties to submit admissible evidence to oppose motions for summary judgment.  Furthermore, once the moving party has pointed to the absence of adequate evidence to support the non-moving party's case, the burden shifts to the non-movant to present facts that show a genuine issue for trial.  See Serrano-Cruz v. DFI Puerto Rico, 109 F.3d 23, 25 (1st Cir. 1997); see also LeBlanc v. Great American Ins. Co., 6 F.3d 836, 841-42 (1st Cir. 1993). "[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 2510 (1986) (citing FED.R.CIV.P. 56(e)). "[P]laintiff . . . [must] offer[ ] . . . 'significant probative evidence tending to support the complaint.' " Id. (quoting First National Bank of Arizona v.

Cities Service Co., 391 U.S. 253, 290, 88 S.Ct. 1575, 1593 (1968)).

**III. DISCUSSION**

In 1992, Congress enacted the Annunzio Wylie Anti-Money Laundering Act. See Pub. L. No. 102-550. The Act, in pertinent part, gave the Secretary of the Treasury power to "require any financial institution, and any director, officer, employee, or agent of any financial institution, to report any suspicious transaction relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1). The desired congressional effect of enacting this Act was to "uncover and punish money laundering, particularly in connection with drug trafficking . . ." through both voluntary and required reporting. Nevin v. Citibank, 107 F.Supp.2d 333, 341 (S.D.N.Y. 2000).

In order to encourage the reporting of "possible violations," the Act incorporated a "safe harbor" provision which states:

> "Any financial institution[2] that makes a disclosure of any possible violation of law or regulation or a disclosure pursuant to this subsection or any other authority, and any director, officer, employee, or agent of such institution, shall not be liable to any person under any law or regulation of the United States[3] or any constitution, law, or regulation of any State or political subdivision thereof, for such disclosure or for any failure to notify the person involved in the transaction or any other person of such disclosure."

31 U.S.C. 5318(g)(3). The "safe harbor" provision read literally grants absolute immunity from any federal and or state cause of action for disclosure of possible violations of law by a financial

---

[2]

BPPR is a financial institution covered by the Act as a commercial bank. See 31 U.S.C. § 5312(a)(2)(B) (defining a financial institution as "a commercial bank or trust company.").

[3]

31 U.S.C. § 5312 (a)(5) defines United States as "the States of the United States, the District of Columbia and, when the Secretary prescribes by regulation, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the Northern Mariana Islands, American Samoa, the Trust Territory of the Pacific Islands, a territory or possession of the United States, or a military or diplomatic establishment."

AO 72
(Rev 8/82)

institution to the appropriate federal law enforcement agency, excepting a federal Constitutional cause of action.

When reporting "possible violations" of law, financial institutions must file a Suspicious Activity Report ("SAR") with "the appropriate Federal law enforcement agencies . . . ." 12 C.F.R. § 208.62 (Regulations on the filing of Suspicious Activity Reports).  SAR's are explicitly covered by the "safe harbor" provision of the Annunzio Wylie Act, which also covers any supporting documentation filed pursuant to the SAR regulations or voluntary reports.  See 12 C.F.R. § 208.62(k).  The amount of jurisprudence focusing on the issue of disclosures made pursuant to the Annunzio Wylie Act is limited.  The plaintiff in the matter at hand encourages the court to interpret the "safe harbor" provision as having an implicit "good faith" requirement as to the disclosures made by a financial institution of possible violations.

To date, only two Federal Circuit Courts have taken a stand on incorporating a "good faith" requirement under the statute and their holdings on the good faith issue are **polar** opposites.  In Lopez v. First Union Nat'l Bank, 129 F.3d 1186, 1191 (11th Cir. 1997), the Court of Appeals for the Eleventh Circuit held that the "safe harbor" provision in the Annunzio Wylie Act granted immunity from liability for "three different types of disclosures:"

"(i) A disclosure of any possible violation of law or regulation,
(ii) A disclosure pursuant to § 5318(g) itself, or
(iii) A disclosure pursuant to any other authority."

Lopez, 129 F.3d at 1191.  The court further explained that in order for banking institutions to be immune for their disclosures under the first above described immunity the institutions were required to meet a further threshold.  See id.  The court stated that "[i]n order to be immune from liability, it is sufficient that a financial institution have a good faith suspicion that a law or regulation may have been violated, even if it turns out in hindsight that none was." Lopez, 129 F.3d at 1192.  Seemingly, the court sua sponte included the a requirement of "good faith suspicion" before the disclosure of possible violations of law or regulation.  The court went on to

Page 10 of 15

decide that, in the particular set of facts over which they were adjudicating, the allegations did not show that plaintiff "had a good faith suspicion that a law had been violated." Id.

Conversely, the Court of Appeals for the Second Circuit resolving the same issue held that there was no qualification on the immunity granted by the "safe harbor" provision of the Annunzio Wylie Act.  See Lee v. Bankers Trust Co., 166 F.3d 540, 542-44 (2nd Cir. 1999). While the court did not opine over whether the "safe harbor" provision only granted immunity in the three types of disclosures specified in Lopez, the court held that the immunity granted was unambiguous and unqualified.  Hence, immunity under the statute is absolute.

The Lee court declined to "import a good faith requirement into the statute." Lee, 166 F.3d at 544.  The court based its holding on several factors.  First and foremost, the court held that the language employed by the statute was clear and unambiguous.  Thus, the "plain meaning of the statute controls its interpretation . . . ." Lee, 166 F.3d at 543 (citing Greenery Rehabilitation Grp., Inc. v. Hammon, 150 F.3d 226, 231 (2nd Cir. 1998)).  In addition, the appeals court  held that there was no room for statutory interpretation or review of the legislative history.  See id.

A second critical consideration employed by the Second Circuit Court in its decision involved view of the legislative history of the Act.  See Lee, 166 F.3d at 543-44.  Although the Second Circuit court believed unnecessary a the review of the legislative history, a cursory glance was made.  The second circuit noted that an "earlier draft of the safe harbor provision included an explicit good faith requirement for statements made in an SAR." Id. (citing 137 Cong. Rec. S16, 642 (1991)).  "However, the requirement was dropped in later versions of the bill, and was not included in the final draft enacted by Congress." Lee, 166 F.3d at 544 (citing 137 Cong. Rec. S17,910, S17,969 (1991)).   Therefore, it was clear for the Lee court that Congress had not only enacted an unqualified "safe harbor" provision, but had also considered including a good faith requirement and had rejected incorporating the same.  Therefore, the court held that the Act

provided "immunity from *any* law for any statement made in a SAR by anyone connected to a financial institution" without any good faith requirement. Lee, 166 F.3d at 543.

The case at hand raises an issue of first impression for this court and to this date for this circuit, on whether the "safe harbor" provision of the Annunzio Wylie Act requires a good faith analysis. The court is persuaded by the reasoning of the Second Circuit Court of Appeals, which based its decision on the plain meaning of statute[4] and on an examination of the legislative history. As the Second Circuit explains, the language of the statute provides unqualified immunity from "any law (except the Federal Constitution) for any statement made in an SAR by anyone connected to a financial institution." Lee, 166 F.3d at 543. Plaintiff in the instant case urges the court to accept the reasoning under Lopez, 129 F.3d at 1186, which incorporated a good faith requirement to the immunity granted by the Annunzio Wylie Act. While the court recognizes the alternate interpretation given by the Eleventh Circuit Court of Appeals, the court finds such jurisprudence unpersuasive in the matter at hand because the literal reading of the law prevails and further even the legislative history points to an unqualified immunity.

Since the "safe harbor" provision of the Annunzio Wylie Act grants immunity from "any law or regulation of the United States, or any constitution, law, or regulation of any State or

---

[4]
In matters of statutory interpretation, we are guided by Supreme Court and First Circuit precedent. The First Circuit Court of Appeals, in performing statutory interpretation, has held that when the words of a statute are clear, the plain meaning of the statute will be enforced. See Campbell v. Washington County Technical Coll., 219 F.3d 3, 6 (1st Cir. 2000); see also United States v. Charles George Trucking Co., 823 F.2d 685, 688 (1st Cir. 1987). "We look first to whether the statutory language is plain and unambiguous." United States v. Commonwealth Energy Sys. & Subsidiary Cos., 235 F.3d 11, 15 (1st Cir. 2000) (citing United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241, 109 S.Ct. 1026, 1030 (1989)); see also Stowell v. Ives, 976 F.2d 65, 69 (1st Cir. 1992). If the statute is clear and unambiguous, then trial courts are counseled enforce the plain meaning of its words. See FMC Corp. v. Holliday, 498 U.S. 52, 57, 111 S.Ct. 403, 407, 112 (1990); see also United States v. Meade, 175 F.3d 215, 219 (1st Cir. 1999). As the Supreme Court in Mohasco Corp. v. Silver, 447 U.S. 807, 827, 100 S.Ct. 2486, 2497 (1980), stated: "in the long run strict adherence to the . . . requirements specified by the legislature is the best guarantee of evenhanded administration of the law."

AO 72
(Rev 8/82)

political subdivision thereof . . . ," only claims for violations of federally granted constitutional rights can lead to the imposition of liability on a reporting financial institution. 31 U.S.C. § 5318(g)(3). On plaintiff's Opposition to defendant's motion for Summary Judgment, only one of his allegations is based on a federal, constitutionally protected, right. Plaintiff alleges that his constitutionally protected right to be free from criminal prosecution except upon a finding of probable cause, was violated, not by the federal authorities, but by defendant BPPR. As is well established, all extended restraints on liberty following an arrest require a judicial finding of good cause. See Gerstein v. Pugh, 420 U.S. 103, 114, 95 S.Ct. 854, 862 (1975). However, BPPR did not effectuate the arrest and a grand jury did find probable cause.

Notwithstanding, Plaintiff urges this court to require financial institutions make a finding of probable cause prior to the filing on a SAR. However, requiring financial institutions to reach a finding of probable cause before filing a SAR would subject them to a drawn out discovery process similar to the imposition of a good faith requirement. In fact, plaintiff seems to confuse the two since on the very next paragraph plaintiff states: "BPPR had no good faith suspicion that Stoutt violated federal law." Congress knew of the option of requiring a finding of probable cause or good faith and elected not to impose such requirements. Using the reasoning previously employed by the Second Circuit, this court agrees that the plain statutory language mandates the result reached herein. See Lee, 166 F.3d at 543. As the Supreme Court described in Harlow v. Fitzgerald, 457 U.S. 800, 813-14, 102 S.Ct. 2727, 2736 (1982), questions of immunity require a necessary weighing of the evils against the benefits entailed by each choice. However, when the statutory language is unambiguous, the court presumes the necessary weighing has been duly performed by Congress, specially since the option to include the good faith requirement was specifically contained in one of the earlier versions of the law.

The Court is concerned by what could be an overly offensive potential use of the disclosure and safe harbor provisions when viewing the facts in the light most favorable to the

Page 13 of 15

plaintiff.  But nevertheless the court ultimately finds that the unambiguity of the statute overrides any court consideration.  "It is not our place simply to alter the balance struck by Congress in procedural [or substantive] statutes by favoring one side or the other in matters of statutory construction."  Mohasco Corp. v. Silver, 447 U.S. 807, 827, 100 S.Ct. 2486, 2497 (1980).

## IV. CONCLUSION

In the case at hand, Plaintiff , under Article 1802 of the Puerto Rico Civil Code, alleged claims for malicious prosecution, unlawful arrest, defamation, and illegal incarceration.  Defendant, as an affirmative defense, claimed immunity from all of plaintiff's state law claims under the "safe harbor" provision of the Annunzio Wylie Act, 31 U.S.C. § 5318(g)(3), which explicitly preempts[5] state law claims filed against financial institutions complying with its requirements.  In matters of preemption, a court can not entertain state law claims which have been explicitly preempted and not authorized to proceed pursuant to a federal statute.

Still, plaintiff argued that the "safe harbor" provision could only be applied to disclosures made in good faith and in this case lacking.  However,"when Congress has made its intent known

---

[5]

When state and federal laws conflict, the Supremacy Clause of the Constitution, U.S. Const., Art. VI, cl. 2, mandates that federal law is "the supreme Law of the Land" and therefore preempts state law.  In deciding the scope of preemption, the Supreme Court has held that "any understanding of the scope of a preemption statute must rest primarily on a fair understanding of congressional purpose" and "[c]ongress' intent of course, primarily is discerned from the language of the preemption statute and the statutory framework surrounding it."  Medtronic , Inc. v. Lohr, 518 U.S. 470, 484, 116 S.Ct. 2240, 2250 (1996) (internal citations omitted) (citing Gade v. National Solid Wastes Management Assn., 505 U.S. 88, 111, 112 S.Ct. 2374, 2390 (1992); Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, 112 S.Ct. 2608, 2617 (1992)).  There is of course no doubt as to the preemption bite in the instant case.

AO 72
(Rev 8/82)

through explicit statutory language, the court's task is an easy one." <u>English v. General Electric</u>

<u>Co.</u>, 496 U.S. 72, 79, 110 S.Ct. 2270, 2275 (1990) (internal citations omitted).  The "safe harbor"

provision is unambiguous in calling for an unqualified immunity from under any federal or state

statute liability for any disclosure made by financial institutions pursuant to its requirements,

save for claims under the Unites States Constitution.  Therefore, all state law claims against

defendant must be dismissed.  Furthermore, plaintiff's constitutional claim is unmeritorious since

a grand jury made a finding of probable cause for his prosecution.  Therefore, plaintiffs

constitutional claim is dismissed as well.  Judgment of dismissal shall be entered accordingly on

all state and federal causes of action.



**IT IS SO ORDERED**.

    In San Juan, Puerto Rico, this 24 day July, 2001.

                    **DANIEL R. DOMINGUEZ**
                    **U.S. District Judge**

C:\WINDOWS\DESKTOP\97-2819.wpd

AO 72
(Rev 8/82)